IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

**TYLER S. MORELAND**                                                                               **PLAINTIFF**

vs.                              CIVIL NO. 2:17-cv-02189-PKH-MEF

**NANCY A. BARRYHILL, Commissioner,**                                              **DEFENDANT**
**Social Security Administration**

<u>**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**</u>

Plaintiff, Tyler S. Moreland, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for child's insurance benefits and supplemental security income (SSI) under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1383(c)(3). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* U.S.C. § 405(g).

### I.    Procedural Background

On February 10, 2014, an application for supplemental security income was filed on behalf of the claimant, who was then a child under the age of 18. (ECF No. 11, p. 262). The alleged date of onset ("AOD") of Plaintiff's disability was July 1, 2006. (ECF No. 11, p. 262). Plaintiff's application was denied initially and upon reconsideration. (ECF No. 11, pp. 131-151). An administrative hearing was held on February 19, 2015, but no decision was issued. (ECF No. 11,

p. 15). The case was then reassigned, and a supplemental hearing was scheduled. (ECF No. 11, p. 15). The supplemental hearing was held telephonically on May 6, 2016. (ECF No. 11, p. 58). Plaintiff testified, and a vocational expert ("VE"), Debra Steele, also testified. (ECF No. 11, pp. 58-79). New records were obtained to further develop the record, and these were then proffered to Plaintiff. Plaintiff subsequently obtained representation and requested another supplemental hearing, which was held on September 9, 2016, in Fort Smith, Arkansas. (ECF No. 11, pp. 80-111). Plaintiff appeared with counsel, Michael Hamby, and testified. (ECF No. 11, pp. 80-111).

By written decision dated September 16, 2016, the ALJ found that before attaining the age of 18 Plaintiff's grand mal seizures were a severe impairment, but that Plaintiff's impairments did not meet or medically equal the severity of any impairment listed in the Listing of Impairments. (ECF No. 11, pp. 20-21). The ALJ found that before reaching the age of 18 Plaintiff had less than marked limitations in the domains of: acquiring and using information; attending and completing tasks; moving about and manipulating objects; and, caring for himself. (ECF No. 11 pp. 24-29). The ALJ found that Plaintiff had no limitations in the domains of interacting with and relating with others, and health and physical well-being. (ECF No. 11, pp. 24-29). The ALJ found that Plaintiff had not developed any new impairments after attaining the age of 18, and that Plaintiff's grand mal seizures continued to be a severe impairment. (ECF. No. 11, p. 29). After discounting Plaintiff's credibility, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: no exposure to hazards such as unprotected heights, moving mechanical parts, or moving machinery, sharp objects or open flames; no commercial driving; no climbing ladders, ropes or scaffolds; no exposure to extremes of heat or cold, or loud or very loud noise environments; and, no work with fast paced production requirements like production rate pace

type work, such as assembly line work. (ECF No. 11, pp. 29-33). With the assistance of a vocational expert, the ALJ determined that jobs exist in significant numbers in the national economy that Plaintiff has been able to perform. (ECF No. 11, pp. 33-34).

On August 18, 2017, the Appeals Council denied Plaintiff's request for review. (ECF No. 11, p. 1). Plaintiff subsequently filed this action on October 12, 2017. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 15, 16), and the case is now ready for decision.

## II. Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. Because the Plaintiff's appeal concerns the limitations resulting from his seizure disorder, the undersigned will recount only the evidence relevant to his claim.

On March 12, 2013, Plaintiff was examined by Dr. Steve-Felix Belinga. Plaintiff reported that he had experienced a seizure the day before his appointment. (ECF No. 11, p. 420). Plaintiff had been weaned off seizure medication as he had experienced two seizure-free years, and it was believed they were controlled. (*Id.*). Plaintiff was then experiencing seizures two to three times per week; feeling them come on most often when he was hungry. (*Id.*). Plaintiff complained of blurred vision, headaches, falls, neck and back pain, as well as occasional stuttering and slurred speech after a seizure. (ECF No. 11, pp. 420, 422). Dr. Belinga increased Plaintiff's Depakote dosage from 500 mg to 750 mg and scheduled an EEG and MRI. (ECF No. 11, p. 423).

On March 15, 2013, an MRI was done; it was found unremarkable by Dr. Belinga. (ECF No. 11, pp. 429-430). On March 26, 2013, Plaintiff had an EEG. Dr. Belinga noted this as an abnormal awake EEG due to the presence of bursts of generalized slowing of unclear significance.

(ECF No. 11, p. 427). Plaintiff had a follow up appointment with Dr. Belinga on March 26, 2013, and he reported no seizures since the last visit. (ECF No. 11, p. 429). Dr. Belinga continued the Depakote dosage without change and instructed Plaintiff to return in three months. (ECF No. 11, p. 430).

On September 12, 2013, Plaintiff returned to Dr. Belinga for his follow up visit, and he reported having a seizure about two weeks prior to the appointment. Plaintiff also reported he was tired more often with wrestling practice, homework, and school taking up most of his time. (ECF No. 11, p. 434). Dr. Belinga discussed adding the medication Keppra in addition to Depakote, prior to tapering off Depakote. (ECF No. 11, p. 435).

On October 14, 2013, Plaintiff reported no seizures since the last visit. (ECF No. 11, p. 438). Plaintiff and his father stated that he was seizure free since August of 2013, and had no new complaints, but he needed a refill for his Medication. (ECF No. 11, p. 446).

On April 14, 2014, Plaintiff saw Nurse Brosnan and reported that he had been seizure free since August of 2013 and needed a medication refill. (ECF No. 11, p. 461).

On May 14, 2014, Plaintiff saw Nurse Brosnan and Dr. Belinga. Plaintiff reported he had new seizure activity since the last visit. Nurse Brosnan noted that his most recent seizure was May 8, 2014, and that it began after Plaintiff slept all day. (ECF No. 11, p. 450). Plaintiff's father described the seizure as violent, involving violent jerking in all extremities, teeth grinding, eyes rolled back in head, and salivating. The seizure reportedly lasted 7 to 8 minutes, with another fifteen minutes or more before Plaintiff was awake and alert again. (ECF No. 11, p. 449). Dr. Belinga recommended an EEG with a Video EEG in 15 days. (ECF No. 11, p. 450).

An EEG was performed on May 29, 2014, and Dr. Belinga found it to be unremarkable. (ECF No. 11, p. 464).

On August 5, 2014 Plaintiff reported that his mother had passed away recently, and he had been feeling depressed. (ECF No. 11, p. 457). He reported seizures a month and a half ago, two weeks ago, and the day before the appointment. (*Id*.). Dr. Belinga increased Plaintiff's Depakote dosage to 1,000 mg. (ECF No. 11, p. 459).

On September 18, 2014 Plaintiff had a follow up appointment with Dr. Belinga. Treatment notes for this visit were very brief, stating only that Plaintiff had a six-year history of seizures, was stable, and to continue current medications. (ECF No. 11, p. 547).

On October 15, 2014, Plaintiff had a follow up appointment. He reported one seizure since his last visit, and he estimated it was roughly three weeks ago. (ECF No. 11, p. 453). Plaintiff was instructed to follow up with the clinic in six months. (ECF No. 11, p. 455).

On January 26, 2015, Plaintiff was admitted to the Sparks Regional Medical Center Emergency Department. (ECF No. 11, p. 501). Emergency Department personnel noted that Plaintiff presented with recurrent seizures, and the occurrence was noted. They noted that Plaintiff informed them his last seizure had been three or four months ago, and that he had been advised by his doctor to get his Depakote levels checked. (*Id*.). His Valproic Acid level (a measure of whether his seizure medication was in the therapeutic range) was 77.7 ug/ml, with a reference range of 50.0-100.0 ug/ml. (ECF No. 11, p. 499).

On February 3, 2015, Plaintiff had his 18th birthday. (ECF No. 11, p. 17).

On February 26, 2015, Plaintiff was again admitted to the Sparks Regional Medical Center Emergency Department. (ECF No. 11, p. 497). Plaintiff complained of dizziness for a few days,

5

and that he felt like he was going to have a seizure but had not had one recently. (*Id*.). His Valproic Acid level was 12.2 ug/ml, with a reference range of 50.0-100.0 ug/ml. (ECF No. 11, p. 496). The diagnosis was subtherapeutic Depakote level and Plaintiff was discharged to home. (ECF No. 11, p. 500).

On April 30, 2015, Dr. Ahmad Al-Khatib performed a consultative neurological evaluation of Plaintiff at the request of the Commissioner. The neurological exam was normal, as was a cranial nerve and motor examination. (ECF No. 11, p. 471). Dr. Al-Khatib diagnosed Plaintiff with generalized tonic-clonic seizure disorder and recommended that Plaintiff be placed on seizure precautions including: avoiding driving, operating heavy dangerous machinery, heights, or swimming. (ECF No. 11, pp. 470-471). Dr. Al-Khatib found there was no definite evidence of limitations in sitting, standing, walking, carrying, handling objects, hearing, or speaking. (ECF No. 11, p. 471). Dr. Al-Khatib also completed a medical source statement and reported that Plaintiff could frequently lift and/or carry 100 pounds. (ECF No. 11, p. 472). He reported that Plaintiff could walk, stand, and sit for eight hours at a time, as well as continuously reach in all directions and operate foot controls bilaterally. (ECF No. 11, pp. 473-474). Dr. Al-Khatib opined that Plaintiff could never climb ladders or scaffolds, but could frequently climb stairs and ramps, balance, kneel, crouch, and crawl. (ECF No. 11, p. 469). Plaintiff, however, needed to avoid all exposure to unprotected heights, moving mechanical parts, and operation of a motor vehicle, and he could only occasionally be exposed to humidity and wetness, dusts, odors, fumes and other pulmonary irritants, and extreme heat and cold. (ECF No. 11, p. 476).

On May 8, 2015, Plaintiff was admitted to the Sparks Regional Medical Center Emergency Department. It was reported that Plaintiff struck his left eyebrow area during a seizure. (ECF No. 11, p. 490). A CT scan revealed soft tissue swelling, and Plaintiff was diagnosed with a small

acute fracture. (ECF No. 11, pp. 487-489). Plaintiff said that he was taking his medication as directed, and that he was still having about one seizure per month on average. (ECF No. 11, p. 490). His Valproic Acid level was 94.8 ug/ml, with a reference range of 50.0-100.0 ug/ml. (ECF No. 11, p. 488).

On June 17, 2016, Plaintiff was seen once more at the Emergency Room at Sparks Regional Medical Center due to a seizure that had reportedly occurred just two hours prior at his home. (ECF No. 11, p. 486). He was discharged that same day and given the limitation of no work for one day. (ECF No. 11, p. 489). Emergency Department personnel noted that Plaintiff had just started a new job working in the heat. (ECF No. 11, p. 486). His Valproic Acid level was 77.2 ug/ml, with a reference range of 50.0-100.0 ug/ml. (ECF No. 11, p. 485).

On January 1, 2016, Plaintiff had a seizure while incarcerated, and he was moved to a safe area and then to a nurse's station. The incident report is not signed, but it indicates postictal erection and snoring were observed. (ECF No. 11, p. 575).

On April 19, 2016, Plaintiff had a follow up while in the Cummins Unit for a seizure on April 17, 2016. (ECF No. 11, p. 564). Plaintiff was seen by Dr. Byrd who noted Plaintiff reported medication compliance, but review showed that he had missed several doses. (ECF No. 11, p. 564).

On July 11, 2015 the Arkansas Department of Corrections completed a Health Classifications and Restrictions form regarding Plaintiff. (ECF No. 11, pp. 550-560). This form notes Plaintiff's last seizure as occurring three weeks prior. (ECF No. 11, p. 558). The enumerated restrictions were that Plaintiff must be housed in the main building on a low bunk, as well as restricting him from assignments where sudden loss of consciousness would be dangerous, such

as working on scaffolding, driving a vehicle, or working near moving machinery. (ECF No. 11, p. 555).

### III. Applicable Law

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but enough that a reasonable mind could accept as adequate to support a conclusion. *Ponder v. Colvin*, 770 F.3d 1190, 1193-94 (8th Cir. 2014). The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). So long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted for at least one year and that prevents him from engaging in substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(3), 1382(3)(C).

There are two separate analyses in this case: first, the childhood standard of disability for the portion of time before the plaintiff turned 18 years old, and second, the adult standard of disability after the plaintiff attained the age of 18.

The Commissioner's regulations require her to apply a three-step sequential evaluation process to determine whether an individual under the age of 18 is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a medically determinable severe impairment, or a combination of impairments that is severe; and, (3) whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing, or that functionally equals the listings.  20 C.F.R. § 416.924.

In determining whether an individual who has attained the age of 18 is disabled, the Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider Plaintiff's age, education, and work experience in light of his residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

### IV.   Discussion

Plaintiff raises the following issues in this matter: (1) whether the ALJ erred in his assessment of Plaintiff's limitations in the six functional domains for child's disability benefits; and, (2) whether the ALJ erred in finding that Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels, with environmental, postural, and mental restrictions. (ECF No. 15, pp. 2-5).

### A. Analysis of Limitations in the Six Domains

The ALJ determined that Plaintiff, before attaining the age of 18, had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, moving and manipulating objects, and caring for himself. The ALJ found no limitations in the domains of health and physical well-being and in interacting and relating with others.

Plaintiff does not argue there was error in finding that he did not meet the listings. Rather, Plaintiff contends that the violence of his seizures should have been found to constitute either a marked or extreme finding in the first (acquiring and using information), second (attending and completing tasks), third (interacting and relating with others), and fourth (moving about and manipulating objects) domains. (ECF No. 15, pp. 2-3). Plaintiff argues that as his recovery from a seizure takes three to five hours it should also be considered at least a marked, if not severe, limitation, in domains one through four.

Functional equivalence may be established by demonstrating marked limitations in two, or extreme limitations in one of the following areas: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and, health and physical well-being. *See* 20 C.F.R. §§ 416.926(b)(1), 416.926a(d). A "marked" limitation is defined as one that "interferes seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). The ALJ should consider all relevant evidence in the case to determine whether a child is disabled, and the evidence may come from acceptable medical sources and from a wide variety of "other sources," including teachers. 20 C.F.R. § 416.92a(a)(2)(iii), SSR 09-2P. The Commissioner's regulations for childhood disabilities "provide that parents and teachers, as well as medical providers, are

important sources of information." *Lawson v. Astrue*, No. 4:08CV282 HEA, 2009 WL 2143754, at * 9 (E.D. Mo. July 13, 2009) (citing 20 C.F.R. § 416.924a).

      i.      <u>Acquiring and Using Information</u>

In the domain of "acquiring and using information," the ALJ considers, inter alia, how well a child acquires, learns, and uses information. 20 C.F.R. § 416.926a(g). An adolescent should continue to demonstrate what he has learned in academic assignments and should also be able to use what he has learned in daily living situations without assistance. An adolescent should be able to comprehend and express both simple and complex ideas, using increasingly complex language in learning and daily living situations. The adolescent should also learn to apply these skills in practical ways that will help him enter the workplace after finishing school. 20 C.F.R. § 416.926a(g)(2)(iv).

The ALJ considered the evaluation of Plaintiff's 10th grade English Teacher, Matt Hominick, who opined that Plaintiff had only a slight problem in seven out of 10 functional subsets of this domain, and no problem in two subsets. (ECF No. 11, 306-307). The ALJ noted that Mr. Hominick reported Plaintiff had an obvious or moderate problem in applying problem solving skills in class discussions. (ECF No.11, pp. 25, 307). Mr. Hominick reported that Plaintiff sometimes had a hard time communicating ideas about what he read, and he had difficulty associating previous ideas with new learning. (ECF No.11, pp. 25, 307). Plaintiff testified in 2016 that although he dropped out of high school the year previously, he was taking classes towards earning a General Equivalence Diploma ("GED"). (ECF No. 11, pp. 23, 30, 69, 119).

The ALJ also considered the opinion of pediatric physician and agency expert, Stephen A. Whaley, M.D., who reviewed the record on March 25, 2014 and opined that Plaintiff had no limitation in his ability to acquire and use information. (ECF No. 11, pp. 24, 136). Pediatric

physician and agency expert, Valeria Malak, M.D., also reviewed the record and opined that Plaintiff had no limitation in his ability to acquire and use information. (ECF No. 11, pp. 24, 147).

Substantial evidence supports the ALJ's finding that Plaintiff had less than marked limitations in acquiring and using information.

    ii.    <u>Attending and Completing Tasks</u>

In the domain of attending and completing tasks, consideration is given to how well a child is able to focus and maintain his attention, and how well the child begins, carries through, and finishes activities, including the pace at which the child performs activities and the ease with which a child changes them. 20 C.F.R. § 416.926a(h). In an adolescent's later years of school, he should be able to pay attention to increasingly longer presentations and discussions, maintain his concentration while reading textbooks, and independently plan and complete long-range academic projects. The adolescent should also be able to organize materials and to plan his time to complete school tasks and assignments. In anticipation of entering the workplace, an adolescent should be able to maintain attention on a task for extended periods of time, and not be unduly distracted by peers, or be unduly distracting to them, in a school or work setting. 20 C.F.R. § 416.926a(h)(2)(v).

In this domain the ALJ again considered the information provided by Mr. Hominick, who advised that Plaintiff had no problem in two subsets, a slight problem in five subsets, and an obvious or moderate problem in four subsets. (ECF No. 11, pp. 25, 308). Mr. Hominick reported that Plaintiff had a serious problem in only one of the 13 subsets – changing from one activity to another without being disruptive. (ECF No. 11, pp. 25, 308). The ALJ also took into consideration the opinions of Drs. Whaley and Malak, who both agreed that Plaintiff had no limitation in attending and completing tasks. (ECF No. 11, pp. 25, 137, 147).

Substantial evidence supports the ALJ's finding that Plaintiff had less than marked limitations in attending and completing tasks.

### iii. Interacting and Relating with Others

Regarding the domain of interacting and relating with others, consideration is given to how well a child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). An adolescent should be able to initiate and develop friendships with children who are his age and to relate appropriately to other children and adults, both individually and in groups. The adolescent should begin to be able to solve conflicts between himself and peers or family members or adults outside his family, and he should recognize that there are different social rules for him and his friends and for acquaintances or adults. The adolescent should be able to intelligibly express his feelings, ask for assistance in getting his needs met, seek information, describe events, and tell stories, in all kinds of environments, and with all types of people. 20 C.F.R. § 416.926a(i)(2)(v).

The ALJ took into consideration Mr. Hominick's opinion that Plaintiff had no problems in the 13 functional subsets of this domain, and that his functioning was age-appropriate. (ECF No. 11, pp. 25, 309-310). The ALJ also cited the opinions of Drs. Whaley and Malak that Plaintiff had no limitation in attending and completing tasks. (ECF No. 11, pp. 26, 137, 147).

Substantial evidence supports the ALJ's finding that Plaintiff had no limitations in interacting with and relating to others.

### iv. Moving About and Manipulating Objects

In the domain of moving about and manipulating objects, consideration is given to how a child moves his body from one place to another and how he moves and manipulates things. 20

C.F.R. § 416.926a(j). An adolescent should be able to use his motor skills freely and easily to get about in his school, the neighborhood, and the community. The adolescent should be able to participate in a full range of individual and group physical fitness activities. He should show mature skills in activities requiring eye-hand coordination and should have the fine motor skills needed to write efficiently or type on a keyboard. 20 C.F.R. § 416.926a(j)(2)(v).

The ALJ again took into consideration the information from Mr. Hominick, who advised that Plaintiff had no problems in the seven functional subsets of this domain, and that his functioning was age-appropriate. (ECF No. 11, pp. 27, 310-311). The ALJ also cited the opinions of Drs. Whaley and Malak that Plaintiff had less than marked limitations in moving about and manipulating objects. (ECF No. 11, pp. 27, 137, 147).

Substantial evidence supports the ALJ's finding that Plaintiff had less than marked limitations in moving about and manipulating objects.

    v.    <u>Weight Given to Physician Opinion</u>

Plaintiff argues the ALJ improperly evaluated Dr. Belinga's medical source statement and lay witness testimony. (ECF No. 15, p. 3). With respect to weight given to the opinions of treating physicians, "[a] claimant's treating physician's opinion will generally be given controlling weight, but it must be supported by medically acceptable clinical and diagnostic techniques and must be consistent with other substantial evidence in the record." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (citing *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014)). "A treating physician's opinion may be discounted or entirely disregarded 'where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id*. "In either case -

whether granting a treating physician's opinion substantial or little weight - the Commissioner or the ALJ must give good reasons for the weight apportioned." *Id*.

The ALJ considered Dr. Belinga's medical source statement and found that it was inconsistent with the treatment record and merited little weight. (ECF No. 11, p. 23). The ALJ considered inconsistencies in the statement itself, as well as with the treatment record. On March 4, 2014, Dr. Belinga completed a seizure medical source statement stating that Plaintiff had seizures two to three times per week. (ECF No. 11, pp. 18, 410). However, Dr. Belinga stated Plaintiff reported: two seizures since his last visit when seen on March 12, 2013; no seizures since last seen on March 26, 2013; one seizure when he was seen on September 12, 2013; and, no seizures when seen on October 14, 2013. (ECF No. 11, pp. 18, 410). Upon examination of the treatment records, Dr. Belinga's assertion that Plaintiff had two to three seizures a week is simply not consistent with his own treatment records. (ECF No. 11, pp. 420-437).

The undersigned finds substantial evidence in the record to support the ALJ's determination to give Dr. Belinga's opinion "little weight."

### B.   RFC Analysis

Plaintiff argues the ALJ erred in finding that Plaintiff had the RFC to perform work at all exertional levels, with environmental, postural, and mental restrictions due to the frequency and violence of Plaintiff's seizures even when on medication. (ECF No. 15, p. 3). More specifically, Plaintiff argues that that in considering his RFC it would not be unreasonable and, in fact, substantial evidence supports, the proposition that an individual with his limitations would be off task at least one-third of the day and would reasonably be expected to miss one day or more per month. (ECF No. 15, p. 4).

A disability claimant has the burden of establishing his or her RFC. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The medical evidence before the Court does not support Plaintiff's allegations concerning the frequency or severity of his seizures. The medical imaging did not show brain abnormalities, and while Plaintiff continued to experience breakthrough seizures during the relevant period, he reported to his doctor that he was improving. (ECF No. 11, pp. 33, 486, 488, 502, 509, 513, 563). The ALJ also noted evidence that Plaintiff was not fully compliant with his medication. (ECF No. 11, pp. 34, 496, 604, 610, 616). The ALJ took into consideration the opinion of examining physician, Dr. Al-Khatib, the lack of opinions from any treating physicians that Plaintiff was unable to work, and Plaintiff's own testimony that he was able to help with housework and attempted to work. (ECF No. 11, p. 32). The ALJ also noted that Plaintiff did not leave the workforce due to restrictions based on his epilepsy, but rather because he broke his hand. (ECF No. 11, pp. 34, 300). The ALJ correctly noted there were no restrictions opined by a treating source that exceeded the RFC finding. (ECF No. 11, p. 33).

The ALJ examined the medical evidence, as well as Plaintiff's description of his own symptoms and limitations, in making his RFC determination. Upon a review of the record, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

### IV. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of September 2018.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE